1
2
3
4
5
6
7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10    AARON W. ATENCIO,

11              Petitioner,                    No. 2:11-cv-2277 KJM CKD P

12        vs.

13    TIMOTHY E. BUSBY,

14          Respondent.                  FINDINGS AND RECOMMENDATIONS

15    _____/

16              Petitioner, a state prisoner, is proceeding pro se with a writ of habeas corpus

17    pursuant to 28 U.S.C. § 2254.  This case proceeds on the petition filed August 9, 2011.  (Dkt. No.

18    1 ("Ptn.").)  Petitioner challenges his May 23, 2008 conviction for murder and conspiracy to

19    commit murder, plus enhancements.   Petitioner claims that his conviction was based on an

20    involuntary confession in violation of his federal due process rights.  Upon careful consideration

21    of the record and the applicable law, the undersigned will recommend that petitioner's

22    application for habeas corpus be denied.

23                              BACKGROUND

24    I.  Facts

25              In its affirmation of the judgment on appeal on May 7, 2010, the California Court

26    of Appeal, Third Appellate District, provided the following factual summary, in which petitioner

1

is identified as "defendant":

On November 20, 2005, Joe Krauter, Chris Medina, and defendant left Bakersfield to drive to Redding in Krauter's Toyota 4-Runner. Their mission was to kill Leo Rapp, a man whom defendant believed had threatened defendant's friend, Breanne Eldredge, and had harmed Eldredge's friend, Victoria S.

Defendant was armed with a .380 semi-automatic handgun and a six-inch fixed blade knife, and had purchased duct tape and zip ties for the purpose of restraining the intended victim prior to death. En route to Redding, defendant and his companions bought six gallons of muriatic acid, disposable respirator masks, safety gloves, and a tarp. The purpose of the muriatic acid was to dispose of the body after the murder. The masks and gloves were obtained to protect the men from the harmful effects of the acid. The tarp was intended to help them transport the body from the murder site to the disposal site, which would be in a remote location where they would dig a burial hole, slowly pour the acid over the body, and then cover the body with earth.

The events that set defendant on this murderous path are fairly complicated.

In October 2004, Victoria began accusing her former boyfriend, Leo Rapp, of a series of rapes. Victoria and Eldredge were close friends. About a month before the murder, Victoria mentioned to Eldredge that she wished "something could be done about [Rapp]." Eldredge proposed defendant as a possible solution. Eldredge had met defendant through the internet and, during their online conversations, defendant professed to be a "freelance bounty hunter." During one chat room exchange, defendant mentioned that he was a "hit man" and wanted to murder someone who had "affronted" another member of the chat room.

About a week before the murder, Eldredge called defendant, explained the situation, and asked if defendant would be willing to help Victoria; defendant responded that he would need money and wanted to talk to Victoria himself. Eldredge passed the phone to her, who told defendant that Rapp had been raping and physically abusing her, and that Rapp had also threatened to rape and beat up Eldredge. Victoria provided defendant with Rapp's description and his place of employment, a list of places frequented by Rapp, and a description of some of his friends. She also mentioned that Rapp had a knife collection.

Through a series of phone calls among defendant, Eldredge, and Victoria, a plan emerged: defendant would drive up to Redding with two friends; Victoria, who worked at a group home for the mentally disabled, would lure Rapp to the group home late at night by telling him she had the money she owed him; defendant's

friends would pose as security guards and escort Rapp from the road to the group home in order to ensure that he was alone; and defendant would have the task of ending Rapp's life.

The original price for the hit was $2,000.  But when Victoria told defendant that she could not pay, defendant decided to complete the job for free as "a personal favor" because Rapp had threatened Eldredge.  Defendant told Eldredge during one phone call, "Any man [who] threatens you is a dead man walking."  Four days before the murder, defendant convinced Krauter and Medina to accompany him to Redding to help carry out the killing.

At roughly the same time as the negotiations between defendant and Victoria, her boyfriend, Alan Edenfield, was driving from Ohio to Redding in order to move in with Victoria.  During the drive, he received a call from Victoria, who said that Rapp had raped her again, but that Edenfield should not "worry about it because she knew somebody that was going to take care of it."  The day before the murder, after Edenfield had reached Redding, Victoria told him that Rapp had raped her a third time. During this conversation, she specified that defendant was the person who would be taking Rapp's life, and that the murder would take place the following night at the group home.

The day of the murder, as planned, Victoria called Rapp and told him to meet her late that night at the group home to collect money she owed him. Defendant and his friends, Krauter and Medina, left Bakersfield at around 3:00 p.m. so they would arrive in Redding by around 10:00 p.m.  Defendant picked up body disposal supplies prior to leaving Bakersfield.  That evening, Victoria and Edenfield drove to Eldredge's apartment to discuss the murder.  After Edenfield said he did not want any part in Rapp's demise, Victoria told him that he did not have to be at the group home when the murder took place, but that she needed him "down the road."  At roughly 9:00 p.m., Eldredge and Edenfield dropped Victoria off at the group home and returned to Eldredge's apartment.  A short time later, Eldredge received a phone call from defendant telling her that he and his friends had arrived.  Eldredge and Edenfield then met defendant, Krauter, and Medina at a high school, and had the men follow them to the group home.

The group home was located down a steep hill at the end of a sparsely populated dead-end street, Harpole Road.  Final preparations for the killing occurred in the garage. Defendant pulled out his knife and removed the duct tape and plastic ties from the 4-Runner, informing Krauter and Medina that they could use those to bind Rapp's hands.  Telling Edenfield that he "was going to be down the road acting as a lookout for when [Rapp] was to show up," Victoria had him change from his bright orange shirt into a darker blue shirt and leather jacket.  She then told Krauter and Medina to have Rapp park at the top of the hill when he

arrived and to escort him down to the garage.  Victoria also had Eldredge write Rapp's personal information on a piece of notebook paper inside a white binder, and handed the binder to the pseudo security guards so they could pretend to "check [Rapp] in" before bringing him down the hill.  She then told Eldredge to act as a lookout with Edenfield in case any of Rapp's friends showed up. Eldredge and Edenfield complied with Victoria's directions, walking up the hill and down the street to oversee the events from afar.

Shortly before 11:00 p.m., Rapp's friends, Michael Turner and Jenen Stoutamore, went to Harpole Road in Turner's truck to scope out the scene prior to Rapp's arrival.  Stoutamore was armed with a large Bowie knife and a smaller pocket knife. The men parked the truck and radioed to Rapp that all appeared quiet. Rapp arrived a few minutes later and was met at the top of the hill by Krauter and Medina, who had Rapp sign his name in the binder and then escorted him down the hill. As Rapp walked down the hill, Turner called his cell phone to make sure everything was fine. Rapp responded, "Yeah, seems okay."

When they reached the garage, Rapp yelled out to Victoria, who was inside the home, "Victoria, what the fuck? Come out here[.] [W]hat are you doing? What's going on?"  Defendant, Krauter, and Medina then grabbed Rapp, and the men "grapple[d]" briefly in the garage before defendant pulled out his knife and stabbed Rapp in the neck.  The blade sliced through some of the muscle and fatty tissue of the neck, but did no damage to any vital structures. Defendant, Krauter, and Medina then wrapped Rapp in the tarp they had brought, secured him with duct tape, and placed him in the back of the Toyota 4-Runner, which had been backed up to the garage.

Meanwhile, Stoutamore was trying unsuccessfully to reach Rapp through his cell phone, and came down the hill to investigate.  At one point, Stoutamore saw Victoria come to a window, look out with a "half panicked" expression, and then shut the curtains again. When he got closer to the garage, he heard what sounded like duct tape being peeled, and saw the tarp being loaded into the 4-Runner. He also saw Victoria, now in the garage, pouring liquid on the floor and using a broom as though she was "trying to clean up some sort of mess."

Noticing someone was standing at the top of the hill, defendant and his friends jumped into the 4-Runner and drove it off the road in search of an alternate escape route.  Stoutamore followed on foot. As defendant attempted to drive it up a hill, the 4-Runner crashed and ended up on its side in a ditch.  Stoutamore ceased pursuit and went back for Turner.  Defendant and Medina kicked out the front window of the 4-Runner to allow the men to climb out of it. Krauter and Medina disappeared into the woods, while defendant

dragged Rapp's deceased body out of the back of the wrecked vehicle. FN1

FN1. The cause of death was asphyxia caused by suffocation.

At this point, Stoutamore and Turner arrived at the crash site and saw Rapp's body lying on the tarp behind the 4-Runner. Turner saw the "large gash on his neck" and yelled to Stoutamore "that [Rapp's] neck was cut and he was not alive." Stoutamore punched defendant in the face. Defendant stumbled backward and reached for his gun. Stoutamore then tackled defendant and yelled, "Gun, gun, gun." A struggle for the firearm ensued. Stoutamore pulled out his Bowie knife and hit defendant in the back of the head with the hilt while Turner managed to remove the gun from defendant's grasp. Turner then took the gun to a nearby house, placed it on the porch, and told the residents to call 9-1-1.

When law enforcement officers arrived a short time later, Turner was yelling at defendant: "You killed my fucking friend. You shouldn't have done that. You've killed my friend." Defendant, lying on the ground with blood coming from the back of his head, did not respond. Defendant's knife was recovered and discovered to have blood on it. Six gallons of muriatic acid were found in the overturned 4-Runner. A box of latex gloves was found under the tarp, and a single latex glove with a red stain was found next to the tarp. Police also found a new roll of duct tape, zip ties, and a shopping bag containing respirator masks.

Defendant was taken to the hospital, where he was treated for his head injury and was interviewed by detectives. Defendant was then taken to the station for further questioning. Ultimately, he confessed to the murder plot and explained that, "for a very good reason," he was the person responsible for ending Rapp's life. The reason, according to defendant, was that he "was blessed and cursed with the talent of raw war."

People v. Atencio, 2010 WL 1820184, at **1-4 (May 7, 2010); see Dkt. 17-2.

II.  Procedural History

On April 16, 2008, an indictment filed in the Shasta County Superior Court charted petitioner with murder in violation of California Penal Code §187(a)[1] (Count I) and conspiracy to commit murder with ten overt acts in violation of §§ 182(a)(1)/187(a) (Count II). The indictment further alleged in Count I that petitioner committed willful, deliberate, and

---

[1] Statutory references in this section are to the California Penal Code.

1   premeditated murder (§ 189) and that he achieved the murder by means in lying in wait

2   (§ 190.2(a)(15).)  As to both counts, the indictment alleged that petitioner personally used a knife

3   (§ 12022(b)) and that a principal was armed with a firearm (§ 12022(a)(1)).  (Lod. Doc. 1[2],

4   Clerk's Transcript on Appeal ("CT") 832-34.)

5        On May 23, 2008, following a jury trial in the Shasta County Superior Court, the

6   jury found petitioner guilty as charged and found all the allegations to be true.  (CT 1011, 1013-

7   30.)  On July 8, 2008, the trial court sentenced petitioner to state prison for a total of two years

8   plus life without the possibility of parole.  As to Count I, the court imposed an indeterminate

9   term of life without the possibility of parole, plus two one-year enhancements.  As to Count II,

10  the court imposed a term of twenty-five years to life, plus two one-year enhancements; this term

11  was stayed pursuant to California Penal Code section 654. (CT 1260-61, 1266-67.)

12       On May 7, 2010, the California Court of Appeal for the Third Appellate District

13  modified the judgment by striking a parole revocation fine and staying the execution of a one-

14  year enhancement pursuant to section 12022(a)(1).  In all other respects, it affirmed the

15  judgment.  2010 WL 1820185, *18.

16       Petitioner filed a petition for review in the California Supreme Court raising five

17  claims, including the claim that the admission of involuntary statements violated his federal

18  constitutional right to due process.  The petition was denied on September 1, 2010.  (Lod. Doc.

19  9.)  Petitioner did not seek habeas relief in any state court.

20       Petitioner commenced the instant action on August 9, 2011.  (Ptn.)  Respondent

21  filed an answer on December 12, 2011 (Dkt. No 17), and petitioner filed a traverse on January

22  13, 2012.  (Dkt. No. 21.)

23  ////

24  ////

25  _____

26  [2] Lodged documents refer to those documents lodged by respondent on December 19, 2011.  (Dkt. No. 18.)

ANALYSIS

I. <u>AEDPA</u>

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 785 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  <u>Id</u>. at 784-785, citing <u>Harris v. Reed</u>, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  <u>Id</u>. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal

law.'"   Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision."   Id. at 786,

citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).   Accordingly, "a habeas court must

determine what arguments or theories supported or . . could have supported[] the state court's

decision; and then it must ask whether it is possible fairminded jurists could disagree that those

arguments or theories are inconsistent with the holding in a prior decision of this Court."   Id.

"Evaluating whether a rule application was unreasonable requires considering the rule's

specificity.   The more general the rule, the more leeway courts have in reaching outcomes in

case-by-case determinations.'"   Id.   Emphasizing the stringency of this standard, which "stops

short of imposing a complete bar of federal court relitigation of claims already rejected in state

court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does

not mean the state court's contrary conclusion was unreasonable."   Id., citing Lockyer v.

Andrade, 538 U.S. 63, 75 (2003).

        The undersigned also finds that the same deference is paid to the factual

determinations of state courts.   Under § 2254(d)(2), factual findings of the state courts are

presumed to be correct subject only to a review of the record which demonstrates that the factual

finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding."   It makes no sense to interpret

"unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

§ 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

same record could not abide by the state court factual determination.   A petitioner must show

clearly and convincingly that the factual determination is unreasonable.   See Rice v. Collins, 546

U.S. 333, 338 (2006).

        The habeas corpus petitioner bears the burden of demonstrating the objectively

unreasonable nature of the state court decision in light of controlling Supreme Court authority.

1    Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

2    court's ruling on the claim being presented in federal court was so lacking in justification that

3    there was an error well understood and comprehended in existing law beyond any possibility for

4    fairminded disagreement."  Harrington, supra, 131 S.Ct. at 786-787.  Clearly established" law is

5    law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van

6    Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will

7    not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006)

8    (established law not permitting state sponsored practices to inject bias into a criminal proceeding

9    by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed

10   guards does not qualify as clearly established law when spectators' conduct is the alleged cause

11   of bias injection).  The established Supreme Court authority reviewed must be a pronouncement

12   on constitutional principles, or other controlling federal law, as opposed to a pronouncement of

13   statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

14        The state courts need not have cited to federal authority, or even have indicated

15   awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8. Where the

16   state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

17   federal court will independently review the record in adjudication of that issue.  "Independent

18   review of the record is not de novo review of the constitutional issue, but rather, the only method

19   by which we can determine whether a silent state court decision is objectively unreasonable."

20   Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

21        Finally, if the state courts have not adjudicated the merits of the federal issue, no

22   AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

23   James v. Ryan, __ F.3d __, 2012 WL 639292 *18-19 (9th Cir. 2012).

24   \\\\\

25   \\\\\

26   \\\\\

1    II.  Merits

2    A.  Petitioner's Claim

3              Petitioner asserts that he was convicted on the basis of an involuntary confession

4    in violation of his constitutional rights to due process.  He asserts that roughly two hours after he

5    was admitted to the Shasta Regional Medical Center for treatment of a lacerated scalp at

6    midnight on November 21, 2005, Detectives Mellon and Schuller entered his hospital room,

7    woke him up, advised him of his Miranda[3] rights, and began questioning him about "the car

8    wreck and Leo Rapp's body."  (Ptn. at 9.)  Petitioner  initially denied that he knew Rapp or "any

9    involvement with the death of Leo Rapp."  (Id.)  In response to detectives' questions and remarks

10   over the next few hours, petitioner "admitted to forging a conspiracy to assault [Rapp]" as

11   punishment for Rapp's actions toward Breanne Eldredge and Victoria S.  Petitioner told

12   detectives "that in the midst of the assault [Rapp] attempted to gouge his eye out," and that

13   petitioner responded by placing a knife against Rapp's neck, inadvertently cutting into his neck

14   and killing him instantly.  (Id. at 9-10.)

15             At 4:45 a.m., petitioner was discharged and taken to the Redding Police

16   Department for further questioning.  After a detective stated that petitioner risked "getting left

17   out in the cold" for not telling the truth about the events of that night, petitioner "agreed . . . that

18   the death of Leo Rapp had been discussed and that a plan had been made for disposing of a

19   corpse[.]"  (Id. at 10.)  At around 10:00 a.m., the interview ended and petitioner was taken to the

20   Shasta County Jail.  (Id.)

21             Based on these events, set forth in greater detail below, petitioner asserts that "the

22   detectives used both direct and implied promises of assistance in exchange for cooperation[.] . . .

23   In direct reaction to these promises and threats, petitioner admitted culpability[.]"  (Id. at 10-11.)

24   \\\\\

25   _____

26        [3] Miranda v. Arizona , 384 U.S. 436 (1966).

1    Respondent argues that the detectives were not being coercive, but were

2    permissibly "pointing out the benefit that might naturally flow from Petitioner's honesty."  (Dkt.

3    No. 17 at 21, citing United States v. Harrison, 34 F.3d 886, 891 (9th Cir. 1994).)  Respondent

4    further argues that, in any event, petitioner was not prejudiced by the trial court's admission of

5    his statements to detectives, in light of copious other evidence that supported the jury's findings

6    of guilt on Counts I and II.  (Id. at 22.)

7    In his traverse, petitioner requests an evidentiary hearing on the merits of his

8    claim.  He argues that the admission of his confession at trial was prejudicial, as the other

9    evidence against him was flawed.  (Dkt. No. 21 at 9-14.)

10   B.  State Court Opinion

11   In the last reasoned state court decision in this claim, the Court of Appeal for the

12   Third Appellate District set forth the following factual background:

13   Defendant was initially interviewed by detectives at the hospital
     following treatment for his head injury.  After being advised of his
14   rights (Miranda v. Arizona (1966) 384 U.S. 436 (hereafter
     Miranda)), defendant delivered his first account of events.

15
     According to defendant, he and friends Krauter and Medina drove
16   to Redding from Bakersfield to visit defendant's friend, Breanne
     Eldredge.  While they were driving around looking for a good
17   place to see the stars, the 4-Runner ended up in the ditch.  After
     climbing out of the wrecked vehicle, they discovered a dead body.
18   They had a tarp and pool cleaning supplies in the back of the
     4-Runner, and decided to move the body with the tarp.  As they
19   were moving the body, two men showed up with flashlights, and
     one of the men hit defendant in the face.

20
     At this point in defendant's statement, a detective commented that
21   he believed some of what defendant was saying was true, but that
     he did not want defendant "to be caught being the guy that's not
22   being completely honest."  The detective told defendant that, if
     Krauter and Medina were being honest with the police, defendant
23   would be "the odd-man out" and "left in the cold." After defendant
     said he understood, one of the detectives stated, "I mean, I'm trying
24   to be real straight with you. We're here as much to help you as we
     can and part of that is being real honest with ya."

25
     When defendant continued with his tale of stumbling across the
26   body after crashing the 4-Runner, a detective said to defendant,

11

"We're here trying to get something going for you. [] ... [] ... But, right now, you're not being honest with us. It's time to start thinking straight, being smart, and as ugly as that may sound, tell us what happened tonight. 'Cause if you aren't doing it, [Krauter] is, or [Medina] is, or the girl at the house is; somebody's talking to the police right now, okay, and the only way you can help yourself, is to tell us what happened. Okay, what was going through your head, why all this bad shit happened, and it's not something you wanted to happen, okay, but from the part where we left Bakersfield, to go see [Eldredge], I think we've kind of gone astray."

Defendant continued with his original story, but the detectives decided to take a "quick break" to allow defendant to "think about things." Before leaving defendant to his thoughts, a detective said, "There's a lot of people out being talked to and by the end of the night, I think we'll put this story together. [] ... [] You do not want to be the odd man out, you want your story to be heard, okay, so think about that for [a] minute[.]"

When the detectives returned, they reminded defendant that "the story just doesn't work" and that he "need[ed] to be straight." At this point, defendant began his second account of events. In his words, "The reason why I came to Redding today, was to see about persuading, so to speak, a Mr. [Rapp], about laying off raping his ex-girlfriend, on multiple such occasions." According to defendant, his "sole intention" was to "administer a simple beating," but when he began to grapple with Rapp in the garage, Rapp managed to gouge one of defendant's eyes, which "engendered such an instinctual ... rage" in defendant that he pulled out his knife and stabbed Rapp. As defendant described it, "You feel life, you know, the seeping of it and you feel the depth of which the flesh caves and the bones give[ ] and the muscle tears. And I felt those things give instantaneously, before I even knew they had and I knew that the damage was completely irreparable, at least I was certain of it."

Defendant then explained that he had driven from Bakersfield to Redding to meet up with Eldredge, and that Eldredge's friend, Victoria, was the one Rapp was accused of raping. The plan was for Rapp to come to the group home where Victoria worked, ostensibly to collect money from her, and then Rapp would be led "dubiously" by Krauter and Medina, posing as security guards, to the garage where defendant would be waiting to administer the beating. According to defendant, things went according to plan until Rapp "tried to gouge [his] eye out," and it was "just kind of a bad coincidence that [the knife] ended up in his throat."

The interview continued at the police station following defendant's discharge from the hospital. One of the detectives asked defendant to "go through [his] statement one more time." Defendant agreed

but wanted to know what he was being charged with.  The detective explained he was not the lead investigator, but his understanding was that Rapp was dead.  The detective then reiterated they were "trying to help" defendant portray the "human side" of the story, and also reminded defendant of his Miranda rights. Defendant indicated he remembered and understood those rights.

Defendant then recounted the same second version of events that he had described at the hospital. Indeed, he did so with some philosophical flourishes.  After explaining that he "was in no personal mood to go so far as to kill the man," he expounded on the nature of death.  "[D]eath is a very painful experience.... [I]t's hard to describe it without the use of the own word itself in the statement of the description[.]  [I]t's the death of enlightenment. You know, life is its own statement of sentient enlightenment and death is, you know, the crossing ... almost, not necessarily, a void thereof, but the reverse of it, you know, a vacuum that sucks it back into a void[.]"

Later in the interview, after defendant explained that he and his companions bought the muriatic acid to clean a driveway when they got back to Bakersfield, one of the detectives said that he had "been able to compare notes" regarding defendant's statement and the statements given by Krauter and Medina, and that Krauter and Medina had confessed the purpose of the trip was to "whack" Rapp and the purpose of the muriatic acid was "for body disposal." Defendant responded, "That's some pretty interesting stuff right there."  The detective then told defendant that Krauter and Medina had admitted "a price was negotiated up front" but, "in the end, they actually agreed that, ... we're not going to do this for money, this guy needs to have his ass whacked, not kicked, but whacked, and we'll just do it."

Defendant was then told, "[I]f you stay on a story that isn't a hundred percent accurate, you know, and claim responsibility for the whole thing, they're not gonna, they look at all the players, they're gonna say, well, [Krauter] was straight, [Medina] was straight, but [defendant] is still saying this was just a big accident, big misunderstanding, you know?  So I'm not, I don't, you know, can't even venture to guess how much movement the [District Attorney's] Office has on a case like this, you know?  It's not a lot, if any.  But again, I think you're getting left out in the cold because you're the one that's not acknowledging what I believe, is the truth, you know?  I ... hope you don't think I'm a stupid person." Defendant responded, "the one most unexpected thing that happened today ... was me killing [Rapp]."  The detective stated, "I, for some strange reason, believe that may be the case, but I think the end result was that somebody was supposed to kill [Rapp], be it Victoria, [Krauter], or [Medina], somehow [he] was supposed to die yesterday."

Defendant then told the detectives his third account of events. The purpose of the trip was to kill Rapp, but defendant doubted whether he would be able to go through with the murder until Rapp gouged defendant's eye, "at which point the doubts were kind of moot." The original price for the hit was $2,000, but when Victoria said she could not pay, defendant decided to do it for free because he believed that Rapp had also threatened Eldredge. The purpose of the duct tape and zip ties was to restrain Rapp prior to the murder. The purpose of the muriatic acid was to dispose of the body, while the masks and gloves were designed to protect the men from the acid. The tarp was intended to help the men transport the body from the murder site to the disposal site without leaving forensic evidence in the 4-Runner.

The trial court denied defendant's pretrial motion to suppress the confession. Finding the confession to have been delivered voluntarily, the court explained the conversations took place in a "relaxed environment," there were no "inappropriate threats by the police or any inappropriate promises," and defendant was given Miranda warnings at the start of the hospital interview and appeared to "completely understand those warnings." Indeed, demonstrating he understood the warnings, defendant explained that, when the detectives read him his rights, he could have said, "[A]ll right, fine, get the hell out of my room, I'll take a lawyer," or "I'll just take the [F]ifth and say the hell with all of you." Throughout the interviews, defendant "professe[d] frequently to be a smart guy, appear[ed] to be intelligent and articulate and understanding of the entire process," and "seemed to enjoy the attention that he was getting and seemed to enjoy talking about himself and being very philosophic during the interview, both at the hospital and in the interview room." The court also pointed out that frequent breaks were taken, defendant was given refreshments, and he was "clearly not nervous" and, "in fact, appear [ed] to enjoy the interview."

2010 WL 1820185, **4-7.

In denying petitioner's involuntary confession claim, the Court of Appeal reasoned:

For reasons to follow, we reject defendant's claim that "one must conclude [his] statements were coerced by implied threats and promises of leniency which rendered those statements involuntary."

"An involuntary confession may not be introduced into evidence at trial," and "[t]he prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made." (People v. Carrington (2009) 47 Cal.4th 145,

14

169; <u>People v. McWhorter</u> (2009) 47 Cal.4th 318, 346.)

"In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.]"

" 'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.' " (<u>People v. Holloway</u> (2004) 33 Cal.4th 96, 114.)

A confession is involuntary "if it is obtained by threats or promises of leniency, whether express or implied, however slight, or by the exertion of any improper influence." (<u>People v. Ramos</u> (2004) 121 Cal.App.4th 1194, 1201.) " 'However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.... Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.]  On the other hand, "if ... the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible...." ' [Citation.]" (<u>People v. Holloway</u>, <u>supra</u>, 33 Cal.4th at p. 115; <u>People v. Carrington</u>, <u>supra</u>, 47 Cal.4th at pp. 170-171.)

Having examined the interviews, we discern no implied threats or promises of leniency. As defendant points out, detectives told him they were "trying to get something going" for him and trying to "help" him to put his "best foot forward" by providing a statement that honestly explained "why all this bad shit happened" and showed "some remorse" for Rapp's death.  However, this cannot be construed as an implied promise of leniency.  In the context of the interview, the detectives were doing nothing more than exhorting defendant to tell the truth and permissibly offering to help him explain his side of the story to the district attorney.  (See <u>People v. Ramos</u>, <u>supra</u>, 121 Cal.App.4th at p. 1204 ["no improper promise of leniency" where the detective "promised only to present evidence of [defendant's] cooperation to the district attorney"].)  The detectives "did not suggest they could influence the decisions of the district attorney," but simply informed defendant that providing an honest account of events might be beneficial in an unspecified way. (<u>People v. Carrington</u>, <u>supra</u>, 47 Cal.4th at p. 174.)  Indeed, immediately before he confessed to the murder plot,

the detectives specifically told him the district attorney would be responsible for charging him and there probably was not a lot of "movement," "if any," as far as which crimes would be charged against him. Consequently, offering to help him explain his side of the story to the district attorney cannot be construed as an implied promise of leniency.

Defendant also faults the detectives for warning him against "being the guy that's not being completely honest" and being the "odd-man out" and "left out in the cold," and for telling him the only way he could help himself was to tell them what happened. According to defendant, these statements constituted a threat that he was in a hopeless situation and would suffer dire consequences unless he confessed. He also complains the statements were repeated after he was told Krauter and Medina had confessed to the murder plot. Thus, he suggests, "the threat that [he] would be 'left out in the cold' if he did not confess to the murder plan like the others ha[d] done was meant to imply that all of the other participants who freely admitted participation in the murder plot would be receiving a more favorable outcome, and that he would be denied a similar benefit because of his refusal to admit the plan to commit murder."

On the contrary, far from threatening defendant, the detectives were simply explaining the natural consequences that would flow from his lying to them, should his coconspirators suffer a crisis of conscience and confess. We have no doubt that, when those words of the detectives were repeated after they informed defendant that Krauter and Medina had confessed, the words carried greater weight in defendant's mind and likely led to the confession that followed immediately. But the fact that a strategy was effective does not make it unconstitutional. "No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence." (People v. Carrington, supra, 47 Cal.4th at p. 174.) This is all that the detectives did in this case. They did not, as defendant claims, imply that Krauter and Medina would receive a more favorable outcome because they confessed, or that defendant would be denied a favorable outcome unless he also confessed.

Contrary to defendant's claim, the statement that the only way for him to help himself was to tell the truth did not constitute "both a threat and a promise." The fact this exhortation to tell the truth was coupled with a suggestion that evidence of guilt was strong and, thus, telling the truth would be a better strategy than denial, does not make it either a threat or a promise of leniency. (See People v. Andersen (1980) 101 Cal.App.3d 563, 583 ["when evidence of guilt is strong, confession and avoidance is a better defense tactic than denial"].)

. . .

Defendant asserts that because of his youth (22 years old when he was interrogated) and his "emotional state" (he had been hit on the head and was in the hospital when the interviews began), he was "particularly vulnerable to improper inducements." The record defeats this suggestion. As the trial court correctly observed, defendant's comments and responses during the interviews showed that he was intelligent, articulate, understood his right to remain silent, and willingly spoke with detectives, "in fact, appear[ed] to enjoy the interview." His comments and responses to questions also demonstrated that his injury had not caused any mental or emotional impairment.

Finally, the record supports the trial court's observations that frequent breaks were taken during the interviews, defendant was given refreshments, he understood his rights to remain silent and to counsel, he answered the detectives' questions intelligently and articulately, and he seemed to enjoy the opportunity to discuss his intelligence and philosophical views with the detectives. These facts support the finding that defendant's confession was voluntary. ( People v. McWhorter, supra, 47 Cal.4th at p. 358 ["The 'mental level and intelligence' of the accused is a factor to be considered when assessing the voluntariness of in-criminating statements"].)

In sum, the trial court did not err in ruling that defendant's statements were voluntary and thus were admissible at trial to prove that he committed the charged offenses.

2010 WL 1820185, **7-10.

C. Legal Standard

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. Blackburn v. Alabama, 361 U.S. 199, 207 (1960). A court on direct review is required to determine, in light of the totality of the circumstances, "whether a confession [was] made freely, voluntarily and without compulsion or inducement of any sort." Withrow v. Williams, 507 U.S. 680, 689 (1993) (internal quotation marks and citation omitted). In light of the totality of the circumstances, "we ask: Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Doody v. Ryan, 649 F.3d 986, 1008 (9th Cir. 2011) (internal quotation marks and citation omitted).

17

1    "[C]oercive police activity is a necessary predicate to the finding that a confession

2  is not 'voluntary' within the meaning of the Due Process Clause." Colorado v. Connelly, 479

3  U.S. 157, 167 (1986).  Generally encouraging a petitioner to tell the truth does not amount to

4  police coercion. Amaya–Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir. 1997).  Police deception

5  alone "does not render [a] confession involuntary," United States v. Miller, 984 F.2d 1028, 1031

6  (9th Cir. 1993), nor is it coercive to recite potential penalties or sentences, including the potential

7  penalties for lying to the interviewer, United States v. Haswood, 350 F.3d 1024, 1029 (9th Cir.

8  2003); see also U.S. v .Bautista-Avila, 6 F.3d 1360, 1364-65 (9th Cir. 1993).   An interrogating

9  agent's promise to inform the government prosecutor about a suspect's cooperation does not

10  render a subsequent statement involuntary, even when it is accompanied by a promise to

11  recommend leniency or speculation that cooperation will have a positive effect.  U.S. v. Leon

12  Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988).

13    "The question of the voluntariness of a confession is a legal issue that requires an

14  independent federal determination." Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996).  A state

15  court's ultimate conclusion that a confession was voluntary is reviewed under Section 2254(d)(1)

16  of the AEDPA.  Lambert v. Blodgett, 393 F.3d 943, 976-978 (9th Cir. 2004).  However, a state

17  court's subsidiary factual conclusions are entitled to the presumption of correctness pursuant to

18  Section 2254(e)(1).[4]  Rupe, 93 F.3d at 1444.

19    Where an involuntary confession is improperly admitted at trial, a reviewing court

20  must apply a harmless error analysis, assessing the error "in the context of other evidence

21  presented in order to determine whether its admission was harmless beyond a reasonable doubt."

22  Arizona v. Fulminante, 499 U.S. 279, 308 (1991).   In the context of habeas review, the standard

23  is whether the error had substantial and injurious effect or influence in determining the jury's

24  _____

25    [4] Title 28 U.S.C. § 2254(e)(1) provides that in a proceeding instituted by a person
   pursuant to a state court judgment, a determination of a factual issue made by a state court shall
   be presumed to be correct, and the petitioner shall have the burden of rebutting the presumption
26  of correctness by clear and convincing evidence.

1   verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Beatty v. Stewart, 303 F.3d 975,

2   994 (9th Cir. 2002).  The analysis must be conducted with an awareness that "a confession is like

3   no other evidence," and that "a full confession may have a 'profound impact' on the jury."

4   Fulminante, 499 U.S. at 296.

5   D. Discussion

6           The facts as set forth by the Court of Appeal are consistent with this court's

7   review of the audio-recorded interview at the Shasta Regional Medical Center (Lod. Doc. 4) and

8   the videotaped interview at the Redding Police Department (Lod. Doc. 5) with petitioner on

9   November 21, 2005.  The record confirms that, in the hospital interview, petitioner sounded alert

10  and articulate as he responded to detectives' questions.  Despite having been treated for a head

11  laceration, he was able to promptly recite from memory his driver's license number and social

12  security number in the opening minutes of the interview.  The interview proceeded in a

13  conversational tone, with the detectives asking open-ended questions such as "Then what

14  happened?" and petitioner answering, often at some length, without additional prodding.  (See

15  Lod. Doc. 4.)

16          At the police station, where the interview continued (this time videotaped),

17  petitioner appeared somewhat tired and disheveled.  However, his interaction with the police was

18  conversational and cooperative.  Petitioner acknowledged that he had been advised of his rights

19  in the hospital and that he understood those rights.  His answers to detectives' questions were

20  expansive and covered a range of topics both philosophical and mundane.  He required little

21  encouragement to describe and opine about the events of November 20, 2005 and the

22  circumstances leading up to them, even while offering different versions of these events over the

23  course of the interviews.  (See Lod. Doc. 5.)  The record confirms that the detectives did not

24  make any threats or promises of leniency; rather, they consistently suggested that petitioner was

25  not being entirely honest and that, given the ongoing investigation of several people involved,

26  petitioner would be better off telling the truth.  Even if these statements were deceptive, that

1  alone would not make petitioner's confession involuntary by constitutional standards.  Miller,

2  984 F.2d at 1031.  In sum, the totality of the circumstances surrounding petitioner's statements

3  do not demonstrate that his "will ha[d] been overborne and his capacity for self-determination

4  critically impaired[.]"  Doody, 649 F.3d at 1008.  Accordingly, the undersigned concludes that

5  the Court of Appeal's determination that petitioner's confession was not involuntary within the

6  meaning of the Due Process Clause was not contrary to, nor an unreasonable application of,

7  federal law.[5]  Thus petitioner's claim for habeas relief should be denied.

8          Nor is petitioner entitled to an evidentiary hearing at this stage.  In Cullen v.

9  Pinholster, __U.S.__, 131 S.Ct. 1388 (2011), the Supreme Court held that, when a state court

10  decides a habeas claim on the merits, the federal court's inquiry under 28 U.S.C. § 2254(d)(1) is

11  limited to the record before the state court.  Courts since Pinholster agree that the limitation of

12  review to the state court record also applies to review under § 2254(d)(2).  E.g., Coddington v.

13  Cullen, No. CIV S 01-1290 KJM GGH, 2011 WL 2118855 (E.D. Cal. May 27, 2011).

14  Here, because the Court of Appeal decided petitioner's habeas claim on the merits, the record on

15  federal habeas review is limited to the record before the state court.  At any rate, as discussed

16  above, the undersigned has reviewed the key evidence in this matter: petitioner's audio- and

17  videotaped interviews with police on the night of November 21, 2005.

18                          CONCLUSION

19          In sum, based on the foregoing analysis, the undersigned finds that petitioner's

20  claim for federal habeas relief on the ground that his confession was involuntary should be

21  denied.

22  \\\\\

23  \\\\\

24

25      [5] In the absence of a finding that petitioner's statements to police were involuntary, the
   court does not reach the issue of whether admission of these statements at trial constituted
26  harmless error.

1    Accordingly, IT IS HEREBY RECOMMENDED that:

2    1.  The petition for writ of habeas corpus (Dkt. No. 1) be denied;

3    2.  This case be closed.

4    These findings and recommendations are submitted to the United States District

5    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

6    days after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties.  Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

9    may address whether a certificate of appealability should issue in the event he files an appeal of

10   the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

11   court must issue or deny a certificate of appealability when it enters a final order adverse to the

12   applicant).  Any reply to the objections shall be served and filed within fourteen days after

13   service of the objections.  The parties are advised that failure to file objections within the

14   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

15   F.2d 1153 (9th Cir. 1991).

16   Dated: November 13, 2012

17

18   CAROLYN K. DELANEY
     UNITED STATES MAGISTRATE JUDGE

19

20

21   2
     aten2277.hc

22

23

24

25

26